UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| E-TERRA, LLC, an Alaska<br>limited liability company,<br><br>Plaintiff and Counter-Defendant,<br><br>vs.<br><br>SARS CORPORATION,<br>a Nevada corporation, and<br>SECURE ASSET REPORTING<br>SERVICES, INC.,<br>a Nevada corporation,<br><br>Defendants and Counter-Claimants. | 3:08-cv-123 JWS<br><br>ORDER AND OPINION<br><br>[Re:   Motions filed at<br>         dockets 59, 61, and 64] |

## I.  MOTIONS PRESENTED

At docket 59, defendants and counter-claimants SARS Corporation ("SARS") and Secure Asset Reporting Service, Inc. ("Secure Nevada") (jointly "Defendants") move for an order precluding plaintiff E-TERRA, LLC ("Plaintiff") from introducing "testimony and evidence regarding Defendants' alleged modification of Plaintiff's software."[1]  Plaintiff's response is at docket 68, and Defendants' reply is at docket 72.

Defendants' second motion *in limine* is found at docket 61.  It asks the court to "preclude testimony and evidence regarding Defendants' alleged misappropriation of the

---

[1]Secure Doc. 59 at p. 1.

'source code' of Plaintiff's software."[2]  Plaintiff responds at docket 68 with an errata at docket 69.  Defendants reply at docket 74.

In a third motion *in limine* at docket 64, Defendants ask the court "to preclude evidence regarding Defendants' alleged possession and control of the Tracpoint software system and determine for the purposes of this litigation that as of June 11, 2009, possession, custody and control of Tracpoint software vested in The Clarence Group LLC."[3]  Plaintiff opposes the motion at docket 73, and Defendants reply at docket 79.

All three motions are ripe for decision.  Oral argument was not requested on any of them.  Oral argument would not assist the court.

## II.  BACKGROUND

Plaintiff and an Alaska corporation named Secure Asset Reporting Service, Inc. ("Secure Alaska") entered into a software licensing agreement with an effective date in November 2001 ("Agreement") which, absent a breach, was of perpetual duration.[4]  It appears that as a result of a corporate reorganization in August of 2007, SARS was assigned or succeeded to the rights and obligations of Secure Alaska as the licensee in the Agreement.  It appears to the court that Secure Nevada is not a party, assignee or successor to a party to the Agreement.

To avoid confusion when discussing the rights and obligations established in the Agreement, the court will refer to the party which has the rights and obligations of the licensee in the Agreement as "Licensee."  As consideration for the license, Licensee agreed to pay Plaintiff the sum of $200,000.[5]  In the Agreement, Plaintiff granted Licensee an exclusive license to use certain software described in Exhibit A to the

---

[2] Doc. 61 at p. 1.

[3] Doc. 64 at pp. 1-2.

[4] Copies of the executed agreement are found at docket 1-2 and at docket 75-2.  The day in November of 2001 when the Agreement became effective is unknown, because the space for insertion of the date in first paragraph of the Agreement is blank.

[5] Agreement § 2.1.

-2-

Agreement ("Software") in specific limited applications. The Agreement contemplated that Software would include all corrections, updates, enhancements, and new releases which might be developed by Plaintiff and delivered to Licensee, but expressly excluded the code underlying the Software: "The Software does not include source code in any form, and Licensee acknowledges that, except as may be expressly provided herein, Licensee has no right to receive any source code or unencrypted macro code for the Software."[6]

The Agreement authorized Licensee to install the Software in object code form on certain computers and also authorized Licensee to keep one copy of the Software for back up and archival purposes.[7] However, the Agreement prohibited Licensee from modifying or creating a derivative work from the Software, transferring the Software to any third party, and attempting to discover or recreate the Proprietary Objects or source code of the Software.[8]

The Agreement required Plaintiff to provide such updates, modifications and maintenance for the Software as Licensee might from time to time request[9] on the terms and at the rates charged to Plaintiff's third-party customers.[10] In the same section, § 2.1, which obligates Plaintiff to provide such Software support, the following provision appears:[11]

> The license granted hereunder shall automatically expand to grant Licensee the additional rights to modify, translate, reverse engineer, decompile, disassemble, create derivative works based on, and copy the Software without additional charge to Licensee if:

---

[6] *Id.* § 1 definition of "Software."

[7] *Id.* § 2.2.

[8] *Id.* § 3.1. "Proprietary Objects" is a term defined in § 1.

[9] *Id.* §2.4.

[10] *See id.* § 1 definition of "Maintenance Order."

[11] *Id.* § 2.1

-3-

Case 3:08-cv-00123-JWS   Document 84   Filed 02/02/10   Page 3 of 8

>   (I) E-Terra fails to provide such Maintenance Services on the terms and conditions as set forth above;
>
>   (ii) E-Terra is unable, despite E-Terra's commercially reasonable efforts, to provide the updates, modules, modifications, additions, or other services requested by Licensee, and such request is capable of being performed by a third party;
>
>   (iii) E-Terra refuses or otherwise fails to provide updates, modules, modification, additions, or other services requested by Licensee on the ground that the request cannot be performed by E-Terra using commercially reasonable efforts, and such request is capable of being performed by a third party; or
>
>   (iv) E-Terra becomes insolvent, liquidates, becomes subject to voluntary or involuntary bankruptcy proceedings, has a receiver appointed, ceases operations or otherwise becomes unwilling or unable to provide future maintenance Services.

The provision quoted in the preceding paragraph is obviously crafted to protect Licensee's interest in the event of unexpected problems, but it is not the only provision in the Agreement written to protect the interests of the Licensee or the Plaintiff against future contingencies. For example, § 8.3 of the Agreement prohibited each party from employing or soliciting the employment of the other's employees or independent contractors. The duration of this restriction was for two years after the employee or independent contractor left his or her engagement, or one year after the termination of the Agreement.

Another prophylaxis against future contingencies is found in §§ 2.5 and 2.6 of the agreement. Section 2.5 provides that the parties will enter an escrow agreement with a third party, DSI Technology Services, to hold certain information to which Licensee would not ordinarily have access. In § 2.6 Plaintiff agreed to deposit with DSI materials sufficient to allow "reasonably skilled programmers to use the Source Code and maintain and enhance the software without reference to any other documentation or aid . . . ." This arrangement meets Plaintiff's need to shelter crucial features relating to the

Software from Licensee, while at the same time providing against the contingency that Plaintiff might cease to be able to support the Software at some point in the future.

Plaintiff's complaint sets out four claims. Plaintiff first claims that SARS breached the Agreement by recruiting one of Plaintiff's employees, disclosing proprietary information about the Software to third parties, making unauthorized modifications to the Software, developing derivatives of the Software, and refusing Plaintiff's request for an audit and inspection. Second, Plaintiff claims that both Defendants have misappropriated Plaintiff's trade secrets in violation of AS 45.50. Third, Plaintiff claims that SARS breached the covenant of good faith and fair dealing implied in the Agreement. Finally, in a very curious fourth claim, Plaintiff alleges that SARS as a party to a contract with Plaintiff intentionally interfered with Plaintiff's rights thereunder and thereby induced a breach of contract. Because SARS itself is alleged to be the other party to Plaintiff's contract, the court surmises that Plaintiff meant to name Secure Nevada as the defendant in this claim.

For their part, Defendants deny liability on all Plaintiff's claims. In addition, SARS pleads two counterclaims. The first counterclaim is that Plaintiff breached the Agreement when it "wrongfully and unilaterally attempted to terminate the Agreement in violation of its terms."[12] The second counterclaim is that Plaintiff breached the covenant of good faith and fair-dealing implied in the Agreement.

### III. DISCUSSION

**A. Motion at Docket 59**

In the first motion *in limine*, Defendants seek to exclude any evidence relating to the modification of the Software by Defendants. The argument is that such evidence is irrelevant to any of the claims brought by Plaintiff, because under § 2.4 of the Agreement, the Licensee acquired the right to modify the Software when Plaintiff filed a Chapter 11, bankruptcy proceeding.

It is not disputed that Plaintiff instituted a Chapter 11 proceeding in 2004. That being said, however, Defendants' argument fails even if its interpretation of § 2.4 of the

---

[12] Defendants' Answer and Counterclaim at ¶ 21.

-5-

Agreement is correct.  To begin with, there is no basis for concluding that none of the modifications alleged were made prior to the bankruptcy filing.  The Agreement was in place for more than two years before Plaintiff initiated the bankruptcy proceeding.  Furthermore, it is possible that if there were modifications made after the Chapter 11 filing the modifications were nevertheless done in breach of the covenant of good faith and fair dealing.  This second possibility arises because Defendants contend that they did not even know about the bankruptcy until long after it was commenced.  Thus, any modifications done after the Chapter 11 proceeding was begun but prior to the time Defendants gained knowledge of the proceeding would have been done with the intent to breach the Agreement.  Were that so, the modifications might give rise to a viable claim relying on the implied covenant of good-faith and fair dealing in the Agreement.

There is also an issue about the meaning of § 2.4.  Defendants are correct to point out that the literal language of subsection (iv) can be read to establish the proposition that the voluntary filing in Chapter 11 gave rise to an "automatic" expansion of the Licensee's rights.  However, even focusing only on that subsection, the fact that all of the other contingencies listed are associated with an inability of the licensor to provide services required under the Agreement raises the question whether "bankruptcy proceedings" may fairly be read to include Chapter 11 proceedings, proceedings which typically leave the debtor in possession and still operating the business.  That interpretation is bolstered when one reads subsection (iv) in the context of § 2.4 as a whole.  The court here takes no position on how the provision might ultimately be interpreted.  Rather, for present purposes, it is adequate to say Defendants have not persuaded the court that their interpretation of what appears to be an ambiguous provision in the Agreement is necessarily correct.

The motion at docket 59 will be denied for the reasons discussed above.  Therefore, the court finds it unnecessary to consider Plaintiff's laches, estoppel, and waiver arguments.

### B. Motion at Docket 61

The motion at docket 61 seeks an order precluding any evidence about Defendants' alleged misappropriation of the source code. This motion is based on the fact that pursuant to §§ 2.5 and 2.6, the source code was delivered to DSI, not Defendants. It is also based on Plaintiff's responses to certain discovery requests. Defendants point out that while Plaintiff denied a request to admit that Defendants had never received any source code for the Software, Plaintiff was unable or simply failed to provide information concerning the occasions on which Defendants did so. Thus, say Defendants, and this is the curious crux of their argument, any evidence of misappropriation is inadmissible because it is irrelevant. In response, Plaintiff takes the position that as it worked with the Licensee, the Licensee's programmers did have the ability to gain access to the source code.

The court cannot determine whether there is merit in Plaintiff's assertion that the Licensee's programmers actually did have access to the source code, but need not make that determination in the context of deciding this motion *in limine*. If there is no evidence that the source code was wrongfully acquired, then of course none will be introduced at trial. However, if there is such evidence, it would be relevant evidence, and therefore, Defendants' relevance-based argument fails.

### C. Motion at Docket 64

Pointing to Plaintiff's claim that Defendants used the Software in the creation of new software dubbed the "Tracpoint" tracking system, Defendants argue that the court should exclude "testimony and evidence regarding Defendants' alleged possession and control of the Tracpoint software system and determine for purposes of this litigation that as of June 11, 2009, possession, custody, and control of Tracpoint software vested in the Clarence Group LLC." Again, the crux of the motion is that such evidence would be irrelevant.

Defendants' motion is nearly frivolous. Plaintiff's claim is that Defendants used the Software in the creation of Tracpoint. If that is true, then it would make no difference whether Tracpoint was subsequently transferred to the Clarence Group. Nor does it matter who owned Tracpoint on June 11, 2009. Whatever competitive threat to

-7-

the Software may be posed by Tracpoint, that threat bears on computation of Plaintiff's damages regardless of whom now controls Tracpoint, or who controlled it on June 11, 2009. If the Clarence Group controls Tracpoint that fact might have some bearing on the quantum of damages Plaintiff could collect, but it would not eliminate the proposition that if Tracpoint were created in breach of the Agreement, Plaintiff is entitled to recover some amount to compensate for the breach of contract.

To the extent it is necessary to determine when the Clarence Group obtained Tracpoint, the issue is not one that needs to be resolved in the process of deciding the instant motion *in limine*. That issue can be resolved in some other context. Perhaps it will be resolved in connection with Defendants' motion for reconsideration at docket 67. Perhaps it will be resolved at trial.

## IV. CONCLUSION

For the reasons set forth above, the motions at dockets 59, 61, and 64 are each **DENIED**.

DATED at Anchorage, Alaska, this 2nd day of February 2010.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE